Clarence W. Cady, Appellee, v. Grand Trunk Western Railway Company, Appellant.

Gen. No. 32,796.

Heard in the first division of this court for the first district at the June term, 1928. Opinion filed February 11, 1929.

McCordic, Dent & Freeman, for appellant.

H. H. Patterson, for appellee; Frank Johnston, Jr., of counsel.

Mr. Justice Matchett delivered the opinion of the court.

The defendant railway company is a common carrier engaged in interstate transportation. On December 2, 1923, plaintiff was in the service of the defendant as conductor of an interstate freight train carrying freight from Chicago, Illinois, to Battle Creek, Michigan. On or about that date, while so employed, he claims to have been injured at or near a place known as Oliver Yard near South Bend, Indiana. He brought suit under the 'Employers' Liability Act, Cahill's St. ch. 114, ¶ 321 *et seq.*, alleging negligence of the defendant company which resulted in his injuries. There was a plea of the general issue and a trial by jury, motions by defendant for an instructed verdict, which were denied, a verdict for $12,500, from which the plaintiff remitted $5,000, and the court entered judgment on the verdict for $7,500 after motions of defendant for a new trial and in arrest had been overruled.

It is argued for reversal that there was no negligence on the part of defendant; that plaintiff's negligence was the sole cause of the accident; that plaintiff assumed the risk. It is urged that the court erred in refusing to give instructions requested by defendant and in requiring defendant to incorporate in a hypothetical question a fact which defendant then contended and now contends had not been proved, that the verdict is excessive and against the manifest weight of the evidence.

The case is unique. It rests almost entirely upon the uncorroborated testimony of the plaintiff.

Plaintiff had been employed by the defendant about 20 years. At the time of the alleged accident (which

date he was unable to give with certainty but which the records of the defendant tend to show with reasonable certainty was December 2, 1923) he was in charge of a freight train of about 40 to 50 cars bound eastward from Chicago, Illinois, to Battle Creek, Michigan. The train crew consisted of plaintiff, the conductor, Yankee, the engineer, Simmons, the fireman, Truxell, and Smith, brakemen. The train dispatcher was one Kay. All of these testified.

The train arrived at Oliver Yard at 8 o'clock p. m., and it was then dark. The railway station was north of defendant's tracks. There was a double track here, which a little farther east terminated in a single track. It was customary after the train was stopped at this place for the engine to go on the south track and pick up cars as directed. Next to the single track on the north was a side or "scale" track. Plaintiff testified:

"If one would come out of the office and go directly south to the track where our train was, he would have to cross one track. If one would go to the west from the office and then go over to the track where our train stood, he would have to cross one track and the termination of the double track."

The tracks at this place ran practically east and west. Just opposite a point about 250 feet to the west of the railway station was a water spout which was used for taking water into the tanks attached to the engines. When the engine was about at this place plaintiff came out of the station office where he had called for his orders, and while the operator was getting these orders for him gave the engineer a signal to come ahead. The train moved in response to the signal. Plaintiff then stepped back into the office to get the orders which were handed to him by the operator, and when he came out with them the train was moving. As the train pulled up slowly he gave the fireman or engineer the orders and went back into the office for his bills. In a minute or a minute and a half he came

out with the bills and started west to get on the rear end of the train. He says that he tried to go back far enough to get away from the tangle of the tracks so that he would have a good footing to get on the train; that between the office and where the engine had taken water there were two cross-overs or switches and that he got back beyond these cross-overs and between the two main tracks; that it was a dark place and the only light he had was a regular railway lamp which burned lard oil and which was used primarily for signal purposes. He says as he went to the rear of the train he had a lantern hanging on his right arm and he had the bills straightening them out to see if he had the proper cars and was putting these in his pocket ready to get on the train; that he put the bills in his pocket; that he could not tell at what speed the train was moving at this time; that it appeared as if it were safe enough to try to get on. He says:

"As the caboose came up to me, I took hold of the hand railing on the extreme rear end to get on; I would naturally take a step as I went to get on, and as I took hold of the hand railing, I stepped into a hole and it threw me out of balance and at the same time the train surged ahead and it caused me to slip. I did not get my foot on, the end of my foot slipped off and I went to the platform and the lower part of my belly hit right on the top of the step. I fell on the step platform. As I took hold of this rail, I noticed the train was going faster than I thought it was because it seemed to move right ahead."

He says that it was the custom to get on the train moving; that it would pull by until the rear end approached and the conductor would get on the rear end. Plaintiff says that the hole into which he stepped was opposite the water standpipe on the south side of the track; that sometimes the water would escape from the pipes in taking water into the engine. He says that the rear brakeman was on the rear platform of

the caboose; that after a few seconds he, plaintiff, "did not know anything, but I realized he had hold of me helping me to get up and I did get up on my feet. I noticed that I was sick, something had twisted in the lower part of my abdomen; it seemed as though something was twisted right out of shape; I was sick at my stomach; I noticed this feeling in my abdomen just to the right side or about the middle, a little low on the right side just opposite the navel and possibly a little bit lower than the navel on the right side. After I was on my feet it hurt me and I had to hold myself; it seemed as though I was falling apart. From the rear platform the hind man helped me a little bit and I got inside onto the locker and partly sat down and partly laid down." He further says that the train did not stop; that after it had gone 8 or 10 miles he felt a little easier and partially fixed up some reports; that when he got to Battle Creek he went into the yard office, signed in and delivered his bills and stayed there probably an hour or better; that he did not feel very good and just sat down and rested awhile. As he remembers, he did not say anything to anybody, but that he "did not feel very good." He says he then walked home, about three-quarters of a mile; that he walked slowly; that he was holding his belly up a little bit; that when he got home he took a warm bath and that his right testicle was swelled; that by that time it was almost morning; that he lay down on a cot and did not go upstairs; that he stayed home the next day; that when he lay down and placed a cushion under him he would be quite comfortable; that he would put a cushion under the side of his abdomen; that he did not call a doctor the next day; that when the time came for his run back to Chicago he went out on the trip, which would have been the day after the accident. He says that it hurt him quite a bit to ride and made the pain come back quite a bit; that the pain was just a little below the navel on the right side; that his bowels would

not move. He says that he did most of his regular work on the return trip; that when the train arrived at Chicago the crew laid over there about 10 or 11 hours and went back the next day; that when he got home that time he had quite a lot of misery because his bowels had not moved; that an enema gave him some relief. He does not know how many runs he made from that time on but thinks he made two or three; that the jar of the train kept him in misery all the time, but if he were quiet and would lie down the pain would not be so much and if he sat down it would practically leave him. He does not remember when he first saw a doctor but it was about the holidays when he went to see Dr. Dugan at Battle Creek. Dr. Dugan took plaintiff to see Dr. MacGregor, surgeon for the defendant company, who prescribed that plaintiff wear a belt in the form of a corset and take Squibbs' oil frequently. He saw Dr. MacGregor just once and he never worked for the defendant company after he saw Dr. Dugan. In the latter part of March or the first of April Dr. Dugan arranged for him to see Dr. Harris, the owner of a private hospital at Battle Creek, and on August 12, 1924, plaintiff was operated on by Dr. Harris, medical treatment up to that time having been cathartics and Squibbs' oil. In November, 1924, plaintiff moved to a farm near Nashville, Michigan, and ever since that time has done farm work.

Plaintiff says he did not know there was a hole along the track at the time he fell; that he had never mounted a train at that particular place before; that when he got on he thinks the train must have been running 12 to 14 miles an hour; that the usual speed was about 5 or 6 miles an hour, and that he first knew the train was moving faster than that just as he started and got hold of it; that he saw the place where the accident happened on the next trip west, walked by it and saw where the cinders and gravel were washed away as far down as the bottom of the ties.

Plaintiff was 54 years of age at the time of the accident. He did not report the accident nor the existence of the supposed hole to the railroad company, although the rules of the company made it his duty to do so. On August 8, 1924, plaintiff consulted Dr. N. H. Adams of Chicago, who examined an X-ray plate and notified plaintiff's attorney that he had sustained an injury which might make worse a latent appendicitis and that there was need of an operation which should not be delayed.

Dr. Harris, who performed the operation on August 12, 1924, states that upon making examination he found that the plaintiff's great omentum (which is the large apron of fat hanging down from the lower border of the stomach and the lower border of the transverse colon, free in the abdominal cavity and in front of the small intestine and the colon) was long and heavily loaded with fat; that a little more than the left half of this great omentum completely rotated upwards in front of the transverse colon and the stomach, while the right half was very thick and crowded in folds partly in front of the transverse colon and partly below it, by which means the great omentum was twisted upon itself. In the opinion of the physician it had become necessary to remove plaintiff's appendix. In response to a hypothetical question, Dr. Harris and Dr. Adams said the conditions making the operation necessary might have been caused by an injury such as plaintiff described.

It is the theory of plaintiff that the evidence tends to prove negligence of the defendant in two respects: (1) In that the engineer moved the train at a greater speed than was reasonable and necessary at the time plaintiff attempted to get on the caboose of the train, and (2) in that defendant permitted the hole to exist at the time and place in question. It is urged that these conditions (namely, the existence of the hole and the speed of the train) were not the ordinary risks of

plaintiff's employment, such as would make the doctrine of assumed risk applicable, and it is strenuously urged that the question of assumed risk, as well as contributory negligence of the plaintiff, was one for the jury under the rules laid down in *Chesapeake & O. Ry. Co. v. De Atley,* 241 U. S. 310; *Davis v. Crane,* 12 Fed. (2d) 355, and the cases cited in those opinions.

If we would regard the facts of the existence of the hole and the speed of the train as established, it would be a very close question upon the law as applied to the facts.

The defendant, however, contends that the verdict of the jury is against the manifest weight of the evidence, and in the view we have come to take of the case, after a very careful consideration of the facts and the law presented in the briefs filed, we think this issue of fact is controlling, and we are constrained to hold that neither the existence of the hole nor the excessive speed of the train is established and that the verdict of the jury, which must have been based on these two supposed facts, is clearly and manifestly against the preponderance of the evidence. Insofar as the hole is concerned, it seems highly improbable that an experienced trainman, as the evidence shows plaintiff to be, would choose to walk back several hundred feet to a dark place, the character of which he did not know, in order to board a train when it was only necessary for him to stand where he was and board it in a place, the character of which he knew and could see to be safe. Indeed, if it were not for the further alleged fact of the rapidity at which the train moved, we would be compelled to say that, assuming all else plaintiff tells, his injuries were the result solely of his own negligence in choosing to board the train in an unusual and negligent manner. A trainman ought to know that under ordinary circumstances it is not wise to take a step in the dark.

Moreover, the uncontradicted facts that plaintiff did not report the alleged accident although it was his duty to his employer to do so; that, according to his own testimony, he saw the hole on the return trip but failed to report it, although it was his duty to do so; that he chose a dangerous way to board the train when a safe way was available; that he called no doctor for almost three weeks after the alleged accident, although he says he was suffering great pain; that he did not report his illness, insofar as the evidence shows, to anyone, tend to create great doubt as to the existence of the facts to which plaintiff testifies. Again, his testimony as to the speed at which the train was moving is improbable and at best is simply the opinion of an interested witness of a fact observed under such circumstances as to give to his testimony little, if any, weight. In addition to this, his evidence as to the speed of the train and the existence of the hole is contradicted by the evidence of the members of the crew, and so far as the speed is concerned the records of the defendant company kept in the usual course of business established to a reasonable certainty that the train did not proceed at a speed of more than 6 or 7 miles an hour. The evidence of plaintiff on these two points is in direct conflict with the testimony of four disinterested and unimpeached witnesses, who it is difficult to believe would testify falsely against the interests of their fellow employee. Plaintiff's testimony, even if it were uncontradicted, would appear to be inherently improbable.

It is urged in plaintiff's brief (in which we think nothing has been left unsaid in favor of his cause) that plaintiff did not make out any reports or fill out any blanks concerning the accident because he did not realize at the time that he was hurt as badly as he was, and that he did not wish to lose time. It is suggested that the fact that he made no report of the hole after

the accident is a circumstance of little or no evidentiary value because plaintiff did not know before the accident that the hole was there, and that inherent improbabilities in plaintiff's description of the manner in which he boarded the train are of little weight in the absence of any description in the record of the caboose or of the relative situation of the grab iron, which plaintiff took hold of. It is said that the reason plaintiff did not consult a doctor for 20 days after the accident was because he did not realize his condition, and it is said in his favor that when he did consult a physician he went to Dr. Dugan, who was a physician of the defendant company. The evidence as to that fact, however, is very doubtful on this record, plaintiff's evidence being at one time that Dr. Dugan was the company's doctor and at another that he had no connection with the company.

It is said that the testimony of Yankee, Simmons, Truxell and Smith is only negative testimony. That is true in a certain sense; but their negative testimony is rendered quite persuasive by the fact that as parties who were working with the plaintiff and in charge of the train with him at the particular time of the alleged accident, in the ordinary and usual course of things, they must have known of the accident had it in fact occurred.

We think, however, there can be no doubt of the duty of this court upon a record such as is presented here. As was said in *Belden v. Innis,* 84 Ill. 78:

"It is the duty of every judge of the circuit court to give careful attention to every part of the testimony in each case, and to consider it with as much care as if the case were tried by the court without a jury. And in all cases where the verdict is manifestly and palpably against the weight of the evidence, the judge of the circuit court should promptly take the responsibility of setting aside the verdict, without subjecting

the parties to the delay and expense of an unnecessary hearing of such questions in this court."

If this admonition of the highest court of the State were more cheerfully obeyed, the labors of the Appellate Courts would be very much reduced.

The conclusion at which we have arrived on this phase of the case makes it unnecessary to consider other points urged.

However, for the reason that the verdict is manifestly and clearly against the evidence, the court erred in not granting defendant a new trial, and for that error the judgment is reversed and the cause remanded.

*Reversed and remanded.*

O'Connor, P. J., and McSurely, J., concur.